IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40191-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRADLEY THOMAS DWYER, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J.P.T.[†] — Bradley Dwyer appeals from a conviction for second degree malicious mischief on the grounds of insufficient evidence and ineffective assistance of counsel. He also challenges the assessment of legal financial obligations. We affirm the conviction, but remand for another determination of financial obligations.

FACTS

This prosecution arises from Bradley Dwyer starting a fire in a jail cell after pounding an iPad on the cells concrete floor. On May 17, 2023, and on preceding days, Dwyer served time in the Kittitas County Jail for a probation violation for leaving the state of Washington. Days earlier Dwyer told Kittitas County Jail Sergeant Jayson Peterson that, if Peterson rendered Dwyer's time harder in jail, he would make Peterson's time harder. Dwyer was angry about his extradition to Washington and his return to jail.

---

[†] George Fearing, a retired judge of the Washington Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

The Kittitas County Jail affords each inmate an iPad. Inmates receive one roll of toilet paper. The jail handbook, given to each inmate, informs the inmate of the rules prohibiting more than one iPad and more than one roll of toilet paper.

All Kittitas County Jail cells have an emergency button that connects to the jail control room. The control room houses an alarm that sounds to indicate the presence of smoke or fire. Personnel in the control room can detect when an inmate pushes the emergency button in his or her cell, and jail staff can talk to the inmate about the emergency. Jail employees check every week to determine whether the emergency buttons work.

On May 16, 2023, Bradley Dwyer occupied a cell in the Kittitas County Jail annex, known as "O-module" or "O-mod." Each door in O-mod bore a red tag that jail staff checked every hour to ensure inmate safety. Dwyer had placed Vaseline on the tags and on handrails in O-mod. Jail employees needed to remove the Vaseline from the tags to ensure the tags worked properly. Dwyer had earlier attempted to cover cameras in O-mod and obscure the view of the inmates housed therein by using spray from a bottle he purloined from the jail's cleaning materials. The Kittitas County Jail issued an infraction to Dwyer for his smearing of Vaseline on tags and handrails.

On the morning of May 17, jail personnel moved Bradley Dwyer from the "O-mod" to cell G-1 for disciplinary reasons. The G-module held two other cells: G-2 and G-3. Another inmate occupied G-3, and G-2 remained empty. Dwyer was the only occupant of cell G-1. Cell G-1 had two bunk beds, a desk, toilet, sink, mirrors, light switch, window, and an alarm. The floor and walls of cell G-1 were concrete.

Contrary to jail rules, Bradley Dwyer had stockpiled iPads and brought three iPads with him to cell G-1. Also contrary to rules, Dwyer possessed three rolls of toilet paper.

Bradley Dwyer testified that, on the morning of May 17, he expressed frustration by smashing, throughout cell G-1, one of his three iPads. Dwyer bounced the iPad off the floor, picked the object up, and smashed the iPad more. While he handled the iPad in front of the cell toilet, the iPad began to smolder. Then a flame shot from the iPad's lithium battery and scorched the inside of the iPad. Dwyer sought to remove the battery, but its heat prevented his touching it. According to Dwyer, he momentarily considered throwing the iPad into the toilet, but he declined to do so after remembering throwing exposed lithium into water can cause a chemical reaction.

Bradley Dwyer testified that he attempted to smother the iPad fire with a food tray. He later used the tray to slide the iPad toward a cell corner where he had placed rolls of toilet paper. The iPad continued to burn. Heavy smoke enveloped the jail cell.

Bradley Dwyer averred to knowing the iPad contained a lithium battery. He concceded recognizing the danger of placing lithium in water, but denied knowledge that the battery could flame. At trial, Dwyer repudiated any intent to start a fire. He denied placing the iPad near the toilet paper for the purpose of perpetuating a fire.

On the morning of May 17, 2023, Kittitas County Jail Sergeant Jayson Peterson, after transferring Bradley Dwyer to cell G-1, stood in the jail's control room. An alarm sounded in the control room, indicating the presence of fire or smoke in cell G-1. Dwyer, however, had not pushed the emergency button in the cell to alert the control room to the smoke. Sergeant Peterson and other jail personnel ambled to the unit and observed cell G-1 "full of smoke." Report of Proceedings (RP) at 89. Peterson saw Dwyer doing pushups in the murky cell. According to Peterson, the smoke emitted a chemical smell. At trial, Sergeant Jayson Peterson testified that seeing Dwyer doing pushups indicated that Dwyer acted intentionally because one does not generally exercise in a smoky room.

After removing Bradley Dwyer from the cell and handcuffing him, Sergeant Jayson Peterson entered the cell to determine the source of the smoke. Peterson found a smashed iPad in the corner of the cell. The lithium battery of the iPad "smoldered." RP at 108-09. Peterson believed the smashed tablet caused the smoke. He saw a "char" mark on the floor, but the mark was not near the iPad. RP at 109. Dwyer had pushed the

4

iPad into the corner of the cell near multiple rolls of toilet paper. The smoldering iPad did not touch the toilet paper.

Daniel Leeroy Johnson, the city of Ellensburg fire inspector, investigated the fire in Bradley Dwyer's cell. Johnson testified at trial that the presence of smoke indicates that a fire occurred. Smoke produced by a lithium battery endangers human life. When a lithium battery is severely damaged — gas, sparks, and heat discharge. Johnson added that all materials in the corner of Dwyer's cell, to where Dwyer pushed the smoldering iPad, were fuel for a fire.

The prosecution showed Dan Johnson a picture of the corner of Bradley Dwyer's cell, which bore a burn mark on the floor. Johnson testified that the char mark likely resulted from the battery emitting smoke and chemicals. He asserted that Dwyer pushed the battery toward the "fuel source," the toilet paper. RP at 160.

Fire investigator Dan Johnson opined that a person's intentional smashing of the iPad caused the fire in Bradley Dwyer's cell. Johnson conceded, however, that he did not know if Dwyer knew that smashing and damaging the iPad, with the lithium battery inside, would create a fire. According to Johnson, the general public lacks knowledge of the potential dangers of lithium batteries. Johnson highlighted, however, that, in addition to smashing the iPad, someone bent the iPad back and forth.

Sergeant Jayson Peterson spent hours responding to the alarm, taking pictures, and conducting an investigation. The fire and smoke interrupted other jail services and activities.

## PROCEDURE

The State of Washington charged Bradley Dwyer with attempted arson in the first degree and malicious mischief in the second degree. The State grounded the malicious mischief charge on the theory that Dwyer knowingly and maliciously created a substantial risk of interruption of government services by destroying government property, the iPad.

Jury instructions No. 16 and No. 17 outlined the elements of the crime of second degree malicious mischief. Jury instruction No. 16 declared:

> A person commits the crime of Malicious Mischief in the Second Degree when he knowingly and maliciously creates a substantial risk of interruption or impairment of service rendered to the public, by physically damaging or tampering with property of the state.

Clerk's Papers (CP) at 86. Jury instruction No. 17, as proposed by the State and delivered to the jury, read:

> To convict the defendant of the crime of Malicious Mischief in the Second Degree, as charged in Count Two, each of the following three elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about May 17, 2023, the defendant created a

substantial risk of interruption or impairment of service rendered to the public by physically damaging or tampering with property of the county; and

    (2) That the defendant acted knowingly and maliciously; and

    (3) That this act occurred in the State of Washington.

    If you find from the evidence that elements (1), (2), and (3) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count Two.

    On the other hand, if after weighing all of the evidence you have a reasonable doubt as to any one of elements (1), (2), or 3, then it will be your duty to return a verdict of not guilty as to Count Two.

(CP) at 87.

Bradley Dwyer initially objected to instruction No. 17 but later withdrew his objection. The initial objection led to a colloquy between both counsel and the trial court:

    MR. MCBRIDE [Defense Attorney]: . . . My main concern is that the jury misinterprets this instruction to say well, if he knowingly and maliciously damaged the property, and the — and that that led to a substantial interruption, then we can convict him. And, that's not as I read this out at all. They have to prove beyond a reasonable doubt that he's—his intent was to create a substantial interruption and the way he fulfilled that intent was by damaging the property.

    THE COURT: Well, let me take a look at how the WPIC [Washington Pattern Jury Instructions – criminal] —

    MR. MCBRIDE: WPIC 85.06.

    THE COURT: All right. Hang on a second.

    MR. MCBRIDE: (Indiscernible), so I guess I would have to withdraw my objection.

    THE COURT: I know I'm—I'm pulling up the WPICs here on this computer, but I had to get it back in here. So, let me—let me see how

7

we've got it. Okay. Oh, wait. Arson related crimes. That on or about the defendant created a substantial risk of interruption or impairment of service. That the defendant acted knowingly and maliciously and that this act occurred in the State of Washington. Well, this is how it is in the WPIC which has been fairly tried and tested. So, you're withdrawing your—

MR. MCBRIDE: Well, I don't like the WPIC but I guess the people that draft the WPIC don't care what I like. But yes, I believe that it actually allows a jury to believe it can—that the knowing and malicious only applies to the damage to property. When in fact, as I understand the statute, they must prove that he knowingly and maliciously intended to create the interruption of public to public service and they chose to go fulfill that intent was by damaging property. An example would be a guy chops down a telephone pole in order to make it fall on a power station and his intent is to blow up the power station. It's not to, you know, it's not just to damage the telephone pole. It's to disrupt the power service. I guess what I'm saying is, he cannot be convicted for an unintended consequence of—of a malicious mischief, of a standard malicious mischief.

THE COURT: Yeah, it says a person is guilty of malicious mischief. This is the statute itself. In the second degree, if he knowingly and maliciously creates a substantial risk of interruption or impairment of service rendered to the public by physically damaging—

MR. MCBRIDE: And, that's my problem. The WPIC gets it backwards. The WPIC reversed itself and leads—

THE COURT: I see what you're saying.

MR. MCBRIDE: Possibly unjust or a result that I don't believe the statute authorizes.

MS. TODD [the State's attorney]: Your Honor, as you consider, I don't see it that way. I see the WPIC as being clear and mostly because when the WPIC outlines subparts 1, 2 and 3, it tells the jury if it's an and or an or component and where it has malicious mischief, it has an and component. So, I think it both is harmonious with the statute 94A.48.080 as well as the WPIC 85.06.

THE COURT: This is 85, huh? That the defendant created the substantial risk and the defendant acted knowingly and maliciously and that this act occurred in the state of Washington.

8

MR. MCBRIDE: The problem is, knowingly and maliciously, does that apply to creating substantial risk or to damaging property? I think it applies to knowingly and maliciously creating a substantial risk. That's how the statute is worded.

THE COURT: Well, you know how we could fix it so that it would read more the way Mr. McBride intends. It wouldn't be that hard to say on or about, you know, such and such a date, the defendant acted knowingly and maliciously and then say that's No. 1 and then No. 2, the defendant created a substantial interruption or impairment of service. And, No. 3, that this act occurred in the State of Washington.

MR. MCBRIDE: What I'd really like is the way it was defined in the opening instruction.

*THE COURT: Hmm. The other thing that could be done, if you wanted to, you could I suppose say that on or about the date and then the defendant and then do the created a substantial risk. And then, two, that the defendant acted knowingly and maliciously in creating this risk.*

*MR. MCBRIDE: That would be better.*

THE COURT: But, I don't know if that's—I mean Ms. Todd, what do you think?

MS. TODD: I take exception to both those.

THE COURT: Okay.

MS. TODD: I think the WPIC is clear and they're giving the read and/or signals.

THE COURT: Yeah.

MS. TODD: And they are prescribing what that behavior is, create a substantial risk.

THE COURT: By doing this.

MS. TODD: And then knowingly and maliciously. So, I don't think it's necessary. I think that the WPICs are tried and true and we should live [sic] 85.06 as is.

THE COURT: Hmm. Well, this WPIC has been used thousands of times over many years. I think I' [sic] gonna leave it the way it is.

MR. MCBRIDE: So, they don't even have to find that he acted knowingly and maliciously?

THE COURT: No, he has to say he acted knowingly—

MR. MCBRIDE: Well, there's an or that this—

9

THE COURT: No, no, no, no. That's or before you get to the next one. We're not gonna [sic] put an or in there.

MR. MCBRIDE: Well, I'm just reading what it says on Instruction No. 17 that on May 17th the defendant created a substantial risk of interruption of impairment of services rendered to the public by physically damaging or tampering with property of the County, or—

THE COURT: And then I would take out the or. The or cannot be in there.

MR. MCBRIDE: And that the defendant acted knowingly.

. . . .

THE COURT: Yeah, it has to be—it has to be—whether you use the and or not, it has to be all ands.

MS. TODD: Correct.

MR. MCBRIDE: All I can say, Your Honor, is I certainly, in closing argument I intended to argue to the jury that they cannot convict my client unless they are convinced beyond a reasonable doubt that his intent in damaging the iPad was to create this interruption in services or disruption. That it can't just follow from the fact that he intentionally damaged the iPad. That's—cause that's how I—that's how I read the statute and understand the law.

THE COURT: When you smash out the window of the police vehicle, which has certainly been upheld as a knowing—as a malicious mischief in the second degree.

MR. MCBRIDE: Mm-hmm.

THE COURT: Do you think they have—that the person who is smashing the windows primary intent is to create a risk of interruption of service or just to smash the window of the police vehicle?

MR. MCBRIDE: I'm glad you set as an example.

THE COURT: Yeah.

MR. MCBRIDE: Because, the State, I don't think in good faith can argue in my case that simply smashing an iPad creates a substantial risk of interruption. The only thing that creates a risk of is Bradley doesn't have an iPad. Whereas what you're talking about when you smash out a car window, the police car window, you're interrupting the—now that—now that cop car is off the road. That's an interruption of service. It's very different.

Again, to me, you cannot be punished under this prong for an unintended consequence of your intentional act of damaging property. You—to use it, to go back to my earlier analogy. You maliciously chop down a tree. Okay? That's all you want to do is chop down the tree, which is worth whatever, $400. But, it then falls like on a power station and takes out like the power to two city blocks. But, you had no idea that was gonna [sic] happen. That wasn't your intent.

I don't think you can be convicted under this prong of MM2 unless they—unless you can prove to the jury that your intent was to take out the city block power by knocking the—by cutting down the tree and making it fall into the power station.

THE COURT: I see.

MS. TODD: The State is prepared to prove that this destruction of the tablet, combined with his not—his ability to have this extra toilet paper and toilet paper rolls, it was all part of his design to—

THE COURT: Mm-hmm.

MS. TODD: —knowingly and maliciously create a substantial interference or interruption of services. He knew that smashing the tablet to bits and then putting it strategically on paper towels and TP that he wasn't entitled to have, was gonna [sic] cause a problem. So, —

MR. MCBRIDE: I'm fine with that theory.

THE COURT: Okay.

RP at 50-57 (emphasis added) (alterations added).

The jury found Bradley Dwyer guilty of second degree malicious mischief but not of first degree arson.

During the sentencing hearing, the trial court asked Bradley Dwyer about his ability to pay legal financial obligations.

THE COURT: Okay. Now, there's some more. Do you have a job right now?

11

MR. DWYER: Currently, I do not. I was expecting to go to jail, so I was putting off seeking.

THE COURT: Well, I expect you to start this afternoon.

MR. DWYER: Certainly, Your Honor.

THE COURT: Or — or tomorrow at the latest with your first application some place. All right? Do you think you have the ability to find a — find a job and be able to pay?

MR. DWYER: Yes, I do, Your Honor.

THE COURT: All right. I think you do too. I'm gonna make a finding that you have the ability to pay. Maybe not today, but you will. So, I'm gonna start $500 for victim assessment penalty. You're gonna pay — let's see, $200 of court costs. You've gotta pay that restitution of $680 and you're gonna start that and it's gonna be $100 a month and I want you to commence that, let's see, you have to find electronic monitoring and a job and you have be on electronic monitoring for a couple of months. And, that's gonna be expensive on its own. So, let's see. I'm gonna have you start making these payments on June 1st. Okay?

RP at 250.

Thus, the court ordered payment of a $500 victim penalty assessment (VPA) and $200 in court costs, for a total of $700 in legal financial obligations. Dwyer's judgment and sentence contains no finding of whether or not Dwyer possessed the financial ability to pay any legal financial obligations.

On the same day as sentencing, Bradley Dwyer filed a motion for an order of indigency and appointment of counsel on appeal. The trial court entered an order of indigency for purposes of appeal.

LAW AND ANALYSIS

On appeal, Bradley Dwyer asserts that his trial counsel performed ineffectively when he failed to object to jury instruction No. 17. Dwyer also asserts that insufficient evidence supported his conviction for second degree malicious mischief. Finally, Dwyer assigns error to the trial court's imposition of legal financial obligations.

Sufficiency of Evidence

Bradley Dwyer argues that insufficient evidence supported his conviction for second degree malicious mischief because the evidence established that he did not know the iPad would catch fire and interrupt jail services. Therefore, the State did not satisfy the knowledge element of the crime. To support his argument, Dwyer compares the facts of his case to those in *State v. Hernandez*, 120 Wn. App. 389, 85 P.3d 398 (2004).

In all criminal prosecutions, the State must prove every element of the charged crime beyond a reasonable doubt. *State v. Mitchell*, 169 Wn.2d 437, 442, 237 P.3d 282 (2010). "To determine whether the evidence is sufficient to sustain a conviction, we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). A defendant's claim of insufficiency admits the truth of the State's evidence and all

inferences that reasonably can be drawn from it. *State v. Salinas*, 119 Wn.2d 192, 201,

829 P.2d 1068 (1992).

RCW 9A.48.080, this state's second degree malicious mischief statute, provides,

in relevant part:

> (1) A person is guilty of malicious mischief in the second degree if
> he or she knowingly and maliciously:
> (a) Causes physical damage to the property of another in an amount
> exceeding seven hundred fifty dollars;
> (b) Creates a substantial risk of interruption or impairment of service
> rendered to the public, by physically damaging or tampering with an
> emergency vehicle or property of the state, a political subdivision thereof,
> or a public utility or mode of public transportation, power, or
> communication; or
> (c) Creates a substantial risk of interruption or impairment of service
> rendered to the public by, without lawful authority, physically damaging,
> destroying, or removing an official ballot deposit box or ballot drop box or,
> without lawful authority, damaging, destroying, removing, or tampering
> with the contents thereof.

RCW 9A.48.080(1)(a)-(c). The defendant commits the crime in one of three ways, (1)

knowingly and maliciously causing physical damage to property exceeding $750, (2)

knowingly and maliciously creating a substantial risk of interruption or impairment of

public service, and (3) damaging or tampering with a ballot box. The State argues only

the second alternative on appeal.

14

Bradley Dwyer impliedly concedes he damaged public property and created a substantial risk of interruption of public service. He contends the State did not prove he acted knowingly and maliciously. We disagree.

Bradley Dwyer relies on *State v. Hernandez*, 120 Wn. App. 389 (2004). A police officer contacted Roberto Carlos Hernandez at school about his alleged involvement in the theft of school property. The officer led Hernandez to a police car and explained he was being detained for the theft. While being handcuffed, Hernandez became belligerent and uncooperative. During the drive to the police station, Hernandez yelled, cursed, and spit into the police vehicle. The officer spent 15 minutes disinfecting the inside of the car after delivering Hernandez to the jail. The State thereafter charged Hernandez with second degree malicious mischief under RCW 9A.48.080(1)(b). Hernandez appealed his conviction for second degree malicious mischief to this court, while arguing that the evidence did not establish that he tampered with the police car, caused physical damage to the car, or interrupted government services.

This court, in *State v. Hernandez*, reversed. We wrote:

> Under the plain terms of RCW 9A.48.080(1), we find insufficient evidence that Mr. Hernandez knowingly and maliciously damaged or tampered with the police vehicle or that he consequently created a substantial risk of interruption or impairment of its service to the public. Unlike the defendant in *Gardner*, Mr. Hernandez did not disrupt emergency services by physically manipulating a device crucial to those services. His

15

actions simply did not rise to the level of knowing and malicious creation of a substantial risk of interruption or impairment of service to the public. Accordingly, we find that the evidence is insufficient to establish second degree malicious mischief beyond a reasonable doubt.

*State v. Hernandez*, 120 Wn. App. 389, 392 (2004).

We find the facts in *State v. Hernandez* divergent from the facts behind Bradley Dwyer's prosecution. This court focused, in *Hernandez*, on whether the evidence satisfied the tampering and physical damage element of the crime, not the knowledge element.

Bradley Dwyer emphasizes his testimony that he lacked knowledge that smashing a lithium battery could create fire. Dwyer underscores that fire investigator Dan Johnson conceded that he did not know if Dwyer knew of the dangers of lithium batteries. According to Dwyer, these facts alone established he lacked knowledge of potential danger and intent to start a fire. He also contends that he lacked any knowledge that smashing the iPad would result in the disruption of jail activities.

Bradley Dwyer's own testimony showed he intended to destroy the iPad. Although Dwyer argues on appeal, and testified at trial, that he did not know smashing the iPad would cause a fire that interrupted jail services, he testified to having basic knowledge of lithium batteries. He conceded that he did not place the burning iPad into

the toilet because he knew combining a lithium battery and water would result in an "even worse chemical reaction." RP at 177.

A reasonable jury could assume that, if Bradley Dwyer had basic knowledge about lithium batteries, the knowledge extended to creating a fire hazard by repeatedly smashing and bending an iPad. A reasonable jury could have discredited Bradley Dwyer's testimony and concluded that he knew the results of his smashing and manipulating the iPad in advance.

Bradley Dwyer intentionally moved the burning iPad closer to the toilet paper after deciding not to place it in the toilet. If one wished to limit damage caused by an item on fire, one would not place the smoking object near paper or flammable materials. Dwyer could have placed the iPad on the cement floor unsurrounded by flammable property. He also could have sought help from jail personnel by pressing the emergency button available to him. Before Dwyer's move to cell G-1, he threatened to render jail staff's jobs more difficult.

Bradley Dwyer's argument of insufficient evidence implies that the State must show that he intentionally caused a fire. The State carried no such burden. The State needed to only show intentional destruction of property combined with an expected interruption in government activity. A reasonable jury could conclude that Dwyer knew

that smashing his iPad would create extra work for jail personnel regardless of whether the iPad created smoke or fire.

Ineffective Assistance of Counsel

Bradley Dwyer argues that he received ineffective assistance of counsel when his attorney withdrew an objection to WPIC 85.06 (Washington Pattern Jury Instructions – criminal) delivered to the jury as instruction No. 17. According to Dwyer, RCW 9A.48.080 requires that the State prove the accused knowingly and maliciously interfered in a public service in addition to knowingly and maliciously destroying government property. Dwyer complains that jury instruction No. 17 informed the jury that the State needed only to show that Dwyer knowingly and maliciously destroyed property. Thus, the instruction incorrectly stated the law and lowered the State's burden of proof. Dwyer adds that jury instruction No. 16 read inconsistently with instruction No. 17.

We agree with Bradley Dwyer that RCW 9A.48.080 demands that the State establish that the accused "knowingly and maliciously" created a substantial risk of interruption or impairment of service. The statute may be ambiguous as to whether the State must also show the accused "knowingly and maliciously" damaged state property, but we need not address this question. Bradley Dwyer impliedly concedes and the

evidence overwhelmingly established that Dwyer knowingly and maliciously smashed and trashed the iPad.

We disagree with Bradley Dwyer that jury instruction No. 17 misstated the law or that the combination of jury instructions No. 16 and No. 17 created confusion. Jury instruction No. 16 nearly verbatim read RCW 9A.48.080 to the jury. The instruction declared: "A person commits the crime of Malicious Mischief in the Second Degree when he knowingly and maliciously creates a substantial risk of interruption or impairment of service rendered to the public, by physically damaging or tampering with property of the state." CP at 86. The structure of jury instruction No. 17 isolated the element of "knowingly and maliciously" conduct such that the mens rea applied to "creating a substantial risk of interruption . . . of service rendered to the public by physically damaging . . . property." CP at 87. The message of jury instruction No. 17 echoed the theme of jury instruction No. 16.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017); U.S. CONST. amend. VI; CONST. art. I, § 22. To demonstrate ineffective assistance of counsel, a defendant must establish that, (1) defense counsel's representation was deficient, *i.e.,* it fell below an

objective standard of reasonableness based on consideration of all the circumstances, and (2) defense counsel's deficient representation prejudiced him. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice means a reasonable probability that, except for counsel's unprofessional error, the result of the proceeding would have been different. *State v. McFarland*, 127 Wn.2d 322, 334-35 (1995).

Bradley Dwyer's trial counsel did not perform ineffectively. Counsel need not object to a jury instruction that correctly states the law. *State v. Gerdts*, 136 Wn. App. 720, 729-30, 150 P.3d 627 (2007). Jury instruction No. 17 was a pattern jury instruction. Counsel does not deficiently represent his or her client when failing to object to a pattern jury instruction. *State v. Studd*, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999); *In the re Involuntary Treatment of A.J.*, 196 Wn. App. 79, 84, 383 P.3d 536 (2016).

Legal Financial Obligations

Bradley Dwyer argues that the trial court erred, because of his indigency, when ordering that he pay a $500 VPA and $200 in court costs. The State argues that, because of Dwyer's comment to the court about an ability to obtain employment, the trial court did not err. According to the State, Dwyer was not indigent at the time of sentencing and for the purpose of paying legal financial obligations. We remand for a determination of

indigency because the trial court failed to thoroughly review Dwyer's financial condition.

Bradley Dwyer's appeal requires the review of four overlapping statutes.

RCW 7.68.035, which addresses a VPA, declares:

> (1) Except as provided in subsection (4) of this section, when any adult person is found guilty in any superior court of having committed a crime . . . there shall be imposed by the court upon such convicted person a penalty assessment. The assessment shall be in addition to any other penalty or fine imposed by law and shall be five hundred dollars for each case or cause of action that includes one or more convictions of a felony . . .
> . . . .
> (4) The court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3).

In turn, RCW 10.01.160(3) directly addresses court costs and indirectly controls a VPA.

The statute reads:

> (3) The court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent. In determining the amount and method of payment of costs for defendants who are not indigent, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose. For the purposes of this section, a defendant is "indigent" if the defendant: (a) meets the criteria defined in RCW 10.101.010(3) (a) through (c); (b) is homeless or mentally ill as defined in RCW 71.24.025; (c) has household income above 125 percent of the federal poverty guidelines and has recurring basic living costs, as defined in RCW 10.101.010, that render the defendant without the financial ability to pay; or (d) has other compelling circumstances that exist that demonstrate an inability to pay.

RCW 10.101.010 provides:

21

The following definitions shall be applied in connection with this chapter:

. . . .

(2) "Available funds" means liquid assets and disposable net monthly income calculated after provision is made for bail obligations. For the purpose of determining available funds, the following definitions shall apply:

(a) "Liquid assets" means cash, savings accounts, bank accounts, stocks, bonds, certificates of deposit, equity in real estate, and equity in motor vehicles. A motor vehicle necessary to maintain employment and having a market value not greater than three thousand dollars shall not be considered a liquid asset.

(b) "Income" means salary, wages, interest, dividends, and other earnings which are reportable for federal income tax purposes, and cash payments such as reimbursements received from pensions, annuities, social security, and public assistance programs. It includes any contribution received from any family member or other person who is domiciled in the same residence as the defendant and who is helping to defray the defendant's basic living costs.

(c) "Disposable net monthly income" means the income remaining each month after deducting federal, state, or local income taxes, social security taxes, contributory retirement, union dues, and basic living costs.

(d) "Basic living costs" means the average monthly amount spent by the defendant for reasonable payments toward living costs, such as shelter, food, utilities, health care, transportation, clothing, loan payments, support payments, and court-imposed obligations.

(3) "Indigent" means a person who, at any stage of a court proceeding, is:

(a) Receiving one of the following types of public assistance: Temporary assistance for needy families, aged, blind, or disabled assistance benefits, medical care services under RCW 74.09.035, pregnant women assistance benefits, poverty-related veterans' benefits, food stamps or food stamp benefits transferred electronically, refugee resettlement benefits, medicaid, or supplemental security income; or

. . . .

22

(c) Receiving an annual income, after taxes, of one hundred twenty-five percent or less of the current federally established poverty level; or
(d) Unable to pay the anticipated cost of counsel for the matter before the court because his or her available funds are insufficient to pay any amount for the retention of counsel.

Finally, RCW 9.94A.760(1) repeats some of the provisions found in the preceding statutes:

Whenever a person is convicted in superior court, the court may order the payment of a legal financial obligation as part of the sentence. The court may not order an offender to pay costs as described in RCW 10.01.160 if the court finds that the offender at the time of sentencing is indigent as defined in RCW 10.01.160(3).

Under former RCW 7.68.035(1)(a) (2018), the sentencing court was required to impose a VPA on any individual found guilty of a crime. Effective July 1, 2023, the legislature amended RCW 7.68.035 to preclude superior courts from imposing a VPA on a defendant who, at the time of sentencing, was found to be indigent as defined in RCW 10.01.160(3). *See* LAWS OF 2023, ch. 449, § 1(4).

Because both RCW 9.94A.760(1) and RCW 10.01.160(1) use the word "may" when authorizing imposition of costs, we refer to such costs as "discretionary costs." *State v. Gonzalez-Gonzalez*, 193 Wn. App. 683, 691, 370 P.3d 989 (2016). The court shall not order a defendant to pay discretionary costs unless the defendant is or will be able to pay them. *State v. Malone*, 193 Wn. App. 762, 765, 376 P.3d 443 (2016). In

determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose. *State v. Malone*, 193 Wn. App. 762, 765 (2016). The trial court must consider important factors such as the defendant's incarceration, income, his assets and other financial resources, his monthly living expenses, his debts, and his employment history. *State v. Ramirez*, 191 Wn.2d 732, 742-43, 426 P.3d 714 (2018).

The sentencing court holds a duty to conduct an on the record, individualized inquiry of the defendant's present and future ability to pay before imposing discretionary fees, not use boilerplate standard language. *State v. Blazina*, 182 Wn.2d 827, 838, 344 P.3d 680 (2015). The court must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry. *State v. Blazina*, 182 Wn.2d 827, 838 (2015).

In Bradley Dwyer's case, the trial court entered no written finding of his ability to pay the court costs or VPA at the time of sentencing. The court asked whether Dwyer could obtain employment, but did not query as to the pay he would receive. The court asked no questions about debt owed by Dwyer.

Bradley Dwyer emphasizes that the trial court, on the day of sentencing, found him indigent for purposes of provision of legal counsel on appeal. The cost of an

appellate counsel would exceed the $700 in legal financial obligations imposed on Dwyer.  Therefore, he might be indigent for purposes of hiring counsel, but not indigent for purposes of legal financial obligations.  RAP 15.2 suggests that the sentencing court renders a determination of indigency for purposes of appeal separate from the decision to declare the defendant indigent for purposes of legal financial obligations.

## CONCLUSIONS

We affirm Bradley Dwyer's conviction for second degree malicious mischief.  We remand to the superior court for purposes of a thorough review of Dwyer's financial condition for purposes of imposition of any legal financial obligations.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.P.T

WE CONCUR:

_____    _____
Staab, A.C.J.                        Cooney, J.